**Todd SIMANSKI and Julia Simanski, as Parents of Olivia Anne Simanski, a minor, Petitioners,**

v.

**SECRETARY OF HEALTH AND HUMAN SERVICES, Respondent.**

No. 03–103V.

United States Court of Federal Claims.

Dec. 15, 2010.

Ronald C. Homer, Boston, MA, for petitioners.

Traci R. Patton, Washington, DC, with whom was Assistant Attorney General Tony West, for respondent.

## MEMORANDUM OPINION AND ORDER

CHRISTINE O.C. MILLER, Judge.

This case, before the court after argument and supplemental briefing on petitioners' motion for review of the special master's order of dismissal, continues the judicial examination of the nature and extent of adversarial proceedings that Congress contemplated under the National Childhood Vaccine Injury Act, 42 U.S.C. §§ 300aa–1–300aa–34 (2006) (the "Vaccine Act"). The special master ruled on the sufficiency of petitioners' expert medical opinions in a show-cause order and dismissed petitioners' case for failing to comply with that order's requirement to submit a sufficient medical opinion. The issue is whether petitioners' perfection of their petition with supporting documentation constituted a prima facie case that the special master could not resolve without requiring respondent to rebut the documentation.

Todd and Julia Simanski, on behalf of their daughter, Olivia Simanski ("Olivia") (collectively, "petitioners"), filed a petition in the United States Court of Federal Claims on January 17, 2003, alleging that Olivia developed Guillain–Barré Syndrome ("GBS") from the administration of a series of vaccines that Olivia received as an infant and seeking compensation under the Vaccine Act. *Simanski v. Sec'y of Health & Human Servs.*, No 03–103V, 2010 WL 2292200, at *1 (Fed.Cl. Spec.Mstr. May 13, 2010) ("*Simanski I* ").[1]

---

1. *Simanski I* attaches and restates the special master's substantive show-cause order filed on

To receive compensation under the Vaccine Act, petitioners must demonstrate that Olivia was given a vaccine enumerated on the Vaccine Injury Table of 42 U.S.C. § 300aa–14 (the "Vaccine Injury Table"), and that this vaccine caused her to develop GBS, an "off-Table" injury, i.e., an injury not set forth in § 300aa–14 as an injury presumed to have been caused by a vaccination. *See* 42 U.S.C. § 300aa–11(c). Special Master Christopher J. Moran was of the view that petitioners had not met their burden of proving causation-in-fact as articulated in *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274, 1278 (Fed.Cir.2005), and particularly discredited petitioners' expert medical opinion. Consequently, he issued a series of orders outlining the reasons why petitioners were deficient in meeting their burden of proof and directing them to supplement their expert medical opinion. Petitioners declined to submit a supplemental expert report. Thereafter, the special master dismissed the petition in an order entered on May 13, 2010, for failure to comply with the show-cause order.

## FACTS

The record is the source of the following procedural history, except when it was captured only in *Simanski I*. The petition, originally assigned to Chief Special Master Gary J. Golkiewicz, alleges that Olivia received the "DPT, HEPB, HIB, IPB and PNU Con" vaccinations and that these vaccinations led to "injuries enumerated by the Vaccine Injury Table, 42 U.S.C. § 300aa–14(a)–(b)" that are presumed to have been caused by a vaccination, or alternatively, that the vaccinations were the result of an "off-Table" injury. Pet. filed Jan. 17, 2003, ¶¶ 3, 7 (Fed.Cl. Spec. Mstr.). However, the petition did not include the medical records required to perfect the filing of a petition, as described in the Vaccine Act and the related Vaccine Rules. *See id.* ¶ 4 ("A fact-specific description of the claimed symptoms and the nature and extent of the injuries caused by the inocula-

tion and condition of Olivia Anne Simanski . . . will be set forth in affidavits which will be filed and is set forth in the medical records which, when filed, will be incorporated by reference herein. . . .").[2] Under the Vaccine Act, a petition for compensation must contain "an affidavit, and supporting documentation, demonstrating" the elements of the petition: that the person who suffered from the injury received a vaccine set forth in the Vaccine Injury Table, that sustained or significantly aggravated an injury either set forth in the Vaccine Injury Table, or that was caused by the vaccine. 42 U.S.C. § 300aa–11(c)(1)(A), (C). The petition should also include:

> maternal prenatal and delivery records, newborn hospital records (including all physicians' and nurses' notes and test results), vaccination records associated with the vaccine allegedly causing the injury, pre- and post-injury physician or clinic records (including all relevant growth charts and test results), all post-injury inpatient and outpatient records (including all provider notes, test results, and medication records), if applicable, a death certificate, and if applicable, autopsy results. . . .

*Id.* § 300aa–11(c)(2); *see also* RCFC App. B, Vaccine R. 2(c)(2)(A) (the "Vaccine Rules") (requiring Vaccine Act petition to be accompanied by "all available medical records supporting the allegations in the petition"). If the claim asserted in the petition "does not rely on medical records alone but is also based in any part on the observations or testimony of any person, the petitioner should include the substance of each person's proposed testimony in a detailed affidavit(s) supporting all elements of the allegations made in the petition." Vaccine R. 2(c)(2)(B)(ii).

Due to petitioners' lack of relevant medical documents, on January 24, 2003, the chief special master issued an order modifying Vaccine Rule 4(a). Order entered Jan. 24,

---

November 20, 2009, reciting and analyzing all of the information of record. *See Simanski I*, 2010 WL 2292200, at *5–24.

**2.** The initial delay in filing Olivia's medical records can be attributed to the difficulty that petitioners encountered in obtaining the medical rec-

ords from Mercy Hospital in Des Moines, Iowa, where Olivia was taken after she experienced respiratory arrest four days after receiving her vaccination shots. *See, e.g.,* Pet'rs' Br. filed May 14, 2003 (Fed.Cl. Spec. Mstr.).

2003, at 1 (Fed.Cl. Spec. Mstr.). Vaccine Rule 4(a) provides that respondent must review the petition to determine whether "all information necessary to determine the validity of the claim has been filed." Vaccine R. 4(a)(1). Vaccine Rule 4(c) (then Vaccine Rule 4(b)) requires respondent to file a report "setting forth a full and complete statement of its position as to why an award should or should not be granted" (a "Rule 4(c) report"). Vaccine R. 4(c)(1). The chief special master concluded that "[o]nly if a complete [p]etition was filed can respondent comply with Rule 4[c]." Order entered Jan. 24, 2003, at 1 (Fed.Cl. Spec. Mstr.). Because petitioners had not filed medical records at that time, the chief special master ordered the parties to participate in a conference call forty-five days from the filing of the petition to discuss among other things, "requests for records, [and] legal impediments to the claim." Id.[3]

Petitioners did not file Olivia's medical records until one year after the filing of the petition. See Order entered Feb. 4, 2004 (Fed.Cl. Spec. Mstr.). Because the records were delayed, the chief special master was unable to issue a decision within the statutorily mandated 240–day time period. Consequently, he issued a notice that petitioners "may withdraw the petition ... or may choose ... to have the petition remain before the special master...." See Order entered Sept. 23, 2003 (Fed.Cl. Spec. Mstr.) (citing 42 U.S.C. § 300aa–12(g)); see also 42 U.S.C. § 300aa–12(d)(3)(A) (requiring special master to issue an opinion within 240 days); Vaccine R. 10(b),(d). By notice filed October 10, 2003, petitioners elected to "continue with [their] [p]etition." Pet'rs' Br. filed Oct. 10, 2003 (Fed.Cl. Spec. Mstr.).

Once petitioners filed their records on January 30, 2004, the chief special master set a sixty-day deadline of April 1, 2004, for respondent to file its Rule 4(c) report. See Order entered Feb. 4, 2004 (Fed.Cl. Spec. Mstr.). However, following a March 16, 2004 status conference, the chief special master ordered petitioners to amend the petition to allege the specific injury that Olivia suffered

and to submit affidavits from Olivia's parents. Order entered Mar. 18, 2004 (Fed.Cl. Spec. Mstr.). By the same order, the chief special master extended the deadline for filing respondent's Rule 4(c) report by ordering respondent to file it within forty-five days of receiving petitioners' amended petition and affidavits. Id. Petitioners filed a status report on April 20, 2004, requesting additional time to comply with the March 18, 2004 order, explaining that they had sent the medical records to a physician for review and that the physician had not expressed an opinion on the claim at that time. Pet'rs' Br. filed Apr. 20, 2004, at 1 (Fed.Cl. Spec. Mstr.). The chief special master granted the request. Order entered Apr. 23, 2004 (Fed.Cl. Spec. Mstr.).

Petitioners filed Julia Simanski's affidavit on May 20, 2004. The affidavit describes Ms. Simanski's observations of Olivia's behavior before and after Olivia received her three-month-old vaccination shots. Affidavit of Julia Simanski, May 5, 2004 (Fed.Cl. Spec. Mstr. May 20, 2004). The affidavit states that Olivia was generally physically well on January 26, 2001, when she received her vaccination shots, but then went into respiratory arrest on January 30, 2001. Id. at 1. At the age of three and one-half, Olivia had little movement in her trunk, arms and legs, was continuously breathing through a ventilator, and was fed through a "g-tube." Id. at 2. Petitioners did not have a definitive diagnosis for Olivia's condition. Id.

Petitioners requested and were granted additional extensions of time to file an amended petition. During an October 14, 2004 status conference, they reported that, prior to rendering an opinion, the physician reviewing Olivia's medical records required a radiologist to examine the x-ray films taken during her initial hospitalization. Order entered Feb. 2, 2005 (Fed.Cl. Spec. Mstr.). Accordingly, the chief special master ordered petitioners to file a status report by November 15, 2004, detailing whether a radiologist had obtained petitioners' x-ray films, what progress had been made by the radiologist in reviewing the films, and when petitioners'

**3.** The authority of a special master to convene a status conference within forty-five days of the filing of the petition is set forth in current Vaccine Rule 4(b).

counsel would be in a position to determine how to proceed. Order entered Oct. 15, 2004 (Fed.Cl. Spec. Mstr.).

The deadline to produce a medical expert report also was extended several times because petitioners' counsel could not obtain the x-ray films to forward to the radiologist, Order entered Nov. 19, 2004 (Fed.Cl. Spec. Mstr.), and on February 2, 2005, the chief special master ordered petitioners to produce the films or show cause why the case should not be dismissed, Order entered Feb. 2, 2005 (Fed.Cl. Spec. Mstr.). The chief special master stated that, under the Vaccine Act, a special master cannot find for petitioners based solely on the claim and that the current record was "devoid" of the necessary supporting medical records or expert opinion. *Id.* Petitioners reported on March 2, 2005, however, that they had forwarded the x-ray film to a reviewing physician and anticipated receiving an expert report. *See* Pet'rs' Br. filed Mar. 2, 2005, at 1 (Fed.Cl. Spec. Mstr.).

Petitioners again received extensions of time. On August 22, 2005, petitioners reported that they had not selected an expert and were seeking replacement counsel because of then-counsel's health issues. *See* Pet'rs' Br. filed Aug. 22, 2005, at 1 (Fed.Cl. Spec. Mstr.). The chief special master granted petitioners' motion substituting current counsel, Ronald C. Homer, as attorney of record on March 23, 2006, and required petitioners to file a status report regarding their efforts to obtain an expert report. Order entered Mar. 23, 2006 (Fed.Cl. Spec. Mstr.). On May 8, 2006, Mr. Homer reported that substantial medical records were missing and must be added to the record. Many of the medical facilities that held the missing documents required pre-payment of the fees to obtain the documents. Once he received all documents, Mr. Homer would undertake to obtain an expert opinion. Pet'rs' Br. filed May 8, 2006, at 1–2 (Fed.Cl. Spec. Mstr.). A subpoena of Olivia's medical records was requested, which the special master granted. Order entered May 10, 2006 (Fed.Cl. Spec. Mstr.).

The case was reassigned on August 7, 2007, to Special Master John F. Edwards, who conducted a status conference on Sep-

tember 12, 2007, to ascertain petitioners' progress in obtaining an expert report. *See* Order entered Sept. 13, 2007 (Fed.Cl. Spec. Mstr.). Counsel for petitioners responded in a status report filed on November 9, 2007, and stated that additional time to file the expert report was needed because of the briefing schedule in a contemporaneous autism omnibus hearing. *See* Pet'rs' Br. filed Nov. 9, 2007, at 1 (Fed.Cl. Spec. Mstr.). The case was delayed further.

Petitioners eventually filed a one-page medical expert report on April 3, 2008, from pediatric neurologist Dr. Paul Maertens. *See* Pet'rs' Br. filed Apr. 3, 2008, Ex. 11 (Fed.Cl. Spec. Mstr.). The report stated that Olivia was diagnosed with "GBS with axial weakness and phrenic nerve involvement" at the Mayo Clinic on March 7, 2001, a diagnosis that subsequently was confirmed by a physician at Johns Hopkins. *See id.* It was Dr. Maertens's opinion that "Olivia's acute respiratory failure was due to RSV" and that "the vaccine [Olivia received as an infant] could have played a role as it was administered during the RSV incubation period." *Id.* Dr. Maertens concluded that the "determination of whether the immunizations were a factor in the onset of GBS in a child who had an upregulated immune system from an infectious process is best made by an immunologist." *Id.* Consequently, the special master "expressed his firm view that the opinion [of Dr. Maertens] fail[ed] to establish petitioners' *prima facie* actual causation claim" at a subsequent status conference. Order entered Apr. 29, 2008 (Fed.Cl. Spec. Mstr.). In response, petitioners represented that they had consulted an immunologist recommended by Dr. Maertens, and the special master subsequently ordered petitioners to file a report from the immunologist or a status report proposing future proceedings. *See id.*

Additional delay in filing an expert report resulted when the immunologist whom petitioners employed continuously backed out and then recommitted to the case. On May 30, 2008, petitioners filed a status report indicating that the medical expert recommended by Dr. Maertens was discussing his availability with petitioners and that, if his

"schedule [would] not permit the necessary time to review [Olivia's] file, counsel [would] seek a new expert in the filed of immunology." Pet'rs' Br. filed May 30, 2008, at 1 (Fed.Cl. Spec. Mstr.). However, on July 11, 2008, petitioners filed yet another status report indicating that the same immunologist now had agreed to review the case and could begin his review on September 1, 2008. *See* Pet'rs' Br. filed July 11, 2008, at 1 (Fed.Cl. Spec. Mstr.). Petitioners proposed to submit their medical expert report by November 3, 2008. *Id.* at 2.

When the case was reassigned to Special Master Moran on August 1, 2008, petitioners had yet to file a report from an immunologist. *See Simanski I*, 2010 WL 2292200, at *9. The special master subsequently entered an order on August 14, 2008, requiring that a supplemental expert opinion be filed by the November 3, 2008 deadline originally proposed by petitioners. Order entered Aug. 14, 2008 (Fed.Cl. Spec. Mstr.). Petitioners filed Olivia's additional medical records on October 1, 2008. *See* Pet'rs' Med. Rs. filed Oct. 1, 2008 (Fed.Cl. Spec. Mstr.). However, rather than filing an expert report on November 3, 2008, petitioners filed a motion for extension of time to file the report, stating that the immunologist whom they believed would submit a report "was no longer available to participate as an expert in petitioners' case due to non-payment of fees in the auto-immune hepatitis b cases in which he testified" and that petitioners, once again, were contacting other immunologists. Pet'rs' Br. filed Nov. 3, 2008, at 1 (Fed.Cl. Spec. Mstr.).

Petitioners eventually submitted a complete medical report from a different immunologist on April 1, 2009, by filing a compact disc containing immunologist Dr. Yehuda Shoenfeld's medical expert report and 117 scientific journal articles in support of his report.[4] *See* Pet'rs' Br. filed Apr. 1, 2009, at 1 (Fed.Cl. Spec. Mstr.). The report set forth how vaccinations generally can cause GBS and concluded "with great confidence and certain[ty][,] I can say that the vaccines with all their immunological aspects were the

cause of the GBS/CIDP leading to phrenic nerve paralysis and failure to extubate Olivia Simanski from artificial respiration." Pet'rs' Ex. 16 filed Mar. 24, 2009, at 15; Pet'rs' Br. filed June 14, 2010, at 6.

The special master discussed Dr. Shoenfeld's report with the parties at an April 13, 2009 status conference. Petitioners contend that respondent raised one challenge: an objection to Dr. Shoenfeld's explanation that Olivia's "immature immune system may lead to a hyper reactive response" as a reason that Olivia's symptoms occurred within four days of receiving the vaccine instead of the usual five to seven days. Pet'rs' Br. filed June 14, 2010, at 6–8 (internal quotation marks omitted). However, the special master ordered petitioners to file a status report by April 20, 2009, and advised them to address five additional questions regarding the sufficiency of Dr. Shoenfeld's report. Order entered Apr. 13, 2009, at 1–2 (Fed.Cl. Spec. Mstr.). The April 13, 2009 order stated:

> If the Simanski[s] believe that the existing record supports a finding that they have met their burden, then *respondent has indicated that he [sic] will file a motion for summary judgment and seek a ruling before obtaining an expert report.* Alternatively, the Simanskis may wish to obtain a supplemental report from Dr. Shoenfeld. If so, the Simanski[s] shall propose a deadline for filing this supplemental report in the status report.

*Id.* at 2 (emphasis added).

Petitioners requested additional time to submit a supplemental report and, on June 3, 2009, filed a supplemental report that addressed one of the five questions set forth in the April 13, 2009 order. *See* Pet'rs' Br. filed June 3, 2009, Ex. 18 (Fed.Cl. Spec. Mstr.). The supplemental report exclusively addressed the issue raised by respondent at the April 13, 2009 status conference and explained why Olivia experienced symptoms one day earlier than expected. *See id.* The special master issued another order on June 26, 2009, stating that the "report is not adequate" and setting a July 24, 2009 deadline

---

4. Although a compact disc containing Dr. Shoenfeld's report was filed on March 24, 2009, five articles referenced in Dr. Shoenfeld's report were not filed until April 1, 2009. *See* Pet'rs' Br. filed Apr. 1, 2009, at 1 (Fed.Cl. Spec. Mstr.).

for the filing of a second supplemental report. Order entered June 26, 2009, at 1 (Fed.Cl. Spec. Mstr.). In doing so, the special master tasked petitioners with answering nine additional questions related to Dr. Shoenfeld's supplemental report. The special master reasoned:

> Obtaining additional information from Dr. Shoenfeld at this time serves several purposes. Before respondent assesses the petitioners' case, petitioners and Dr. Shoenfeld should make as complete disclosure as possible. More information from Dr. Shoenfeld is especially advantageous in this case because during the April 13, 2009 status conference, *respondent stated that it intended to file a motion for summary judgment,* arguing that petitioners had not met their burden as established by [*Althen,* 418 F.3d at 1278.]

*Id.* at 4 (emphasis added).

In a response to the June 26, 2009 order, petitioners asserted that their supplemental report addressed the issue raised by respondent and that petitioners were hopeful that respondent would concede liability. *See* Pet'rs' Br. filed July 24, 2009, at 3 (Fed.Cl. Spec. Mstr.). Petitioners took the position that they had established a prima facie case, declining further to supplement their medical expert report until respondent filed its report that set forth reasons why the petition did not merit compensation. *See id.* at 4. Petitioners also were concerned that the special master's orders had served as a disincentive for respondent to resolve the case and had provided respondent with a road map to object to the sufficiency of Dr. Shoenfeld's opinion. *Id.* Petitioners suggested that the special master could invite respondent to move for summary judgment, in which case petitioners would file a response and the special master could issue a ruling on the existing record. *Id.* Petitioners declined to supplement their report during an August 27, 2009 status conference held to discuss petitioners' position. *Simanski I,* 2010 WL 2292200, at *10. Respondent made no filing.

■ On November 20, 2009, the special master issued a lengthy order directing petitioners to show cause why their case should not be dismissed for failing to comply with the April 13, 2009 and June 26, 2009 orders to supplement their expert medical report. *See Simanski I,* 2010 WL 2292200, at *6–24. The order was not entered solely as a sanction for failure to comply with the April 13, 2009 and June 26, 2009 orders. Rather, the order outlined Olivia's medical history, the procedural history of the case, the reasons dismissal was justified, and the grounds for finding that the petition did not establish causation-in-fact. The order was a de facto analysis of the merits.

The special master relied on 42 U.S.C. § 300aa–12(d)(3)(B) as authority to require petitioners to supplement their expert report. *Simanski I,* 2010 WL 2292200, at *10. Section 300aa–12(d)(3)(B) provides, as follows:

> In conducting a proceeding on a petition a special master—
>
> (i) may require such evidence as may be reasonable and necessary,
>
> (ii) may require the submission of such information as may be reasonable and necessary,
>
> (iii) may require the testimony of any person and the production of any documents as may be reasonable and necessary,
>
> (iv) shall afford all interested persons an opportunity to submit relevant written information—
>
> (I) relating to the existence of the evidence described in section 300aa–13(a)(1)(B) of this title, or
>
> (II) relating to any allegation in a petition with respect to the matters described in section 300aa–11(c)(1)(C)(ii) of this title, and
>
> (v) may conduct such hearings as may be reasonable and necessary.
>
> There may be no discovery in a proceeding on a petition other than the discovery required by the special master.

42 U.S.C. § 300aa–12(d)(3)(B). The special master interpreted this statute as affording him broad discretion to "solicit information." *Simanski I,* 2010 WL 2292200, at *10 (citing *Whitecotton v. Sec'y of Health & Human Servs.,* 81 F.3d 1099, 1108 (Fed.Cir.1996);

*Snyder v. Sec'y of Health & Human Servs.,* 88 Fed.Cl. 706, 713–15, 737–38 (2009)).

The show-cause order additionally set forth the authority of a special master to dismiss a case for failure to comply with an order. *Id.* at * 11 (citing, *inter alia,* Vaccine R. 21(b); *Sapharas v. Sec'y of Dep't of Health & Human Servs.,* 35 Fed.Cl. 503, 505 (1996) (holding special master did not abuse discretion in dismissing case for failure to comply with order to produce medical documents required for petition to be filed); *Tsekouras v. Sec'y of Dep't of Health & Human Servs.,* 26 Cl.Ct. 439, 443 (1992) (sustaining special master's dismissal for failure to comply with order to file medical documents that Vaccine Act makes a jurisdictional requisite), *aff'd per curiam,* 991 F.2d 810 (Fed.Cir.1993) (unpublished table decision)).

The special master outlined two analytical frameworks articulated by the United States Court of Appeals for the Federal Circuit to apply in determining whether dismissal is an appropriate sanction for failure to comply. Both cases cited by the special master, *Wexell v. Komar Industries, Inc.,* 18 F.3d 916 (Fed.Cir.1994), and *Refac International, Ltd. v. Hitachi, Ltd.,* 921 F.2d 1247 (Fed.Cir. 1990), are patent cases on appeal from federal district courts in the Sixth and Ninth Circuits, respectively. The Federal Circuit analyzed whether the trial court appropriately dismissed each case for failure to comply with the trial court's order by applying a factor-based analysis. *See Wexell,* 18 F.3d at 920; *Refac,* 921 F.2d at 1254. In *Wexell* the Federal Circuit affirmed a dismissal pursuant to Fed.R.Civ.P. 37(b)(2)(C) after oral argument on defendant's motion to dismiss for failure to comply with discovery deadlines. *Wexell,* 18 F.3d at 920. Guided by Sixth Circuit precedent, the Federal Circuit considered 1) whether the moving party was prejudiced by the non-movant's failure to cooperate, 2) whether the non-moving party was warned of the potential for dismissal, and 3) whether a less severe sanction was considered. *Id.*

In *Refac* a magistrate judge, in response to motions to compel discovery and a motion to dismiss, stayed proceedings and recommended that the district court judge direct entry of judgment against the plaintiff and dismiss the complaint for failure to comply with a discovery order and consider a sanctions inquiry. *Refac,* 921 F.2d at 1250–53. After additional motions and hearings, the district court dismissed the case pursuant to Fed.R.Civ.P. 37(b)(2)(C). *Id.* at 1253. Reviewing the Rule 37 sanctions, the Federal Circuit explained that a trial court should consider: 1) the public's interest in expeditious resolution of the litigation, 2) the court's need to manage its docket, 3) the risk of prejudice to the defendants, 4) the public policy favoring a disposition of cases on their merits, and 5) the availability of less drastic sanctions. *Id.* at 1254. The special master in the instant case analyzed the appropriateness of an order to dismiss for failure to comply under a combination of these factors. *Simanski I,* 2010 WL 2292200, at *12–23.

In examining whether a less severe sanction was available, the special master assessed the merits of Olivia's case, concluding that dismissal appears to be appropriate given that "other possible sanctions would be tantamount to a dismissal" because "Dr. Shoenfeld's opinion is critical to petitioners' case." *Id.* at *12. According to the special master, petitioners "must rely on Dr. Shoenfeld's 'medical opinion'" to establish that Olivia's condition was caused by a vaccination, but "Dr. Shoenfeld's two reports fail to meet the petitioners' burden of producing persuasive evidence" under the causation test articulated in *Althen. Id.* In *Althen* the Federal Circuit articulated the standard for proving that a vaccine was the cause in fact of an injury for the purposes of 42 U.S.C. § 300aa–11(c). 418 F.3d at 1278. Under this standard, petitioners must show

> by preponderant evidence that the vaccination brought about the injury by providing: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury.

*Id.* The special master proceeded to analyze the petition under each of the *Althen* prongs, weighing the information on record as to

whether petitioners had established causation.

The special master first found that Dr. Shoenfeld's two reports failed to present a medical theory causally connecting the vaccination and the injury. *See generally Simanski I*, 2010 WL 2292200, at *12–17. The special master generally took issue with the reports' indefinite language and Dr. Shoenfeld's failure to articulate explicitly the connection between his medical theories and Olivia's condition.

Specifically, the special master stated that Dr. Shoenfeld's reports failed to identify the vaccination that caused Olivia's GBS, instead of merely listing four vaccinations that she received. *See id.* at *12. Because they did not advance petitioners' causation theory, the special master took issue with Dr. Shoenfeld's assertions that "various vaccines" that Olivia did not receive were "associated with" or "involved with" GBS. *Id.* The special master also determined that Dr. Shoenfeld's statement that the "pertussis vaccine can aggravate other infections" was too indefinite—if Dr. Shoenfeld believed that vaccine aggravated Olivia's RSV, the special master concluded that Dr. Shoenfeld should explicitly assert such theory. *Id.* at *13. With regard to RSV, Dr. Shoenfeld's conclusion that " 'it is also conceivable that the early vaccination aggravated the effects of the RSV' " fell short of the more-probable-than-not standard. *Id.* (citation omitted).

The special master cited Dr. Shoenfeld's failure to state explicitly how his theory and supporting articles connected to Olivia. For example, many of the articles provided by Dr. Shoenfeld discussed the "whole cell version of the pertussis vaccine." *Id.* Olivia did not receive the whole cell version. *Id.* Other articles discussed the actual disease that develops, and these articles "seem to hold less significance" because the vaccine Olivia was administered presumably contained an "inactivated pertussis toxin." *Id.*

According to the special master, Dr. Shoenfeld also appeared to advance inconsistent theories. Dr. Shoenfeld asserted at one point that "an unspecified vaccine caused Olivia's GBS," but later advanced the idea that the "acellular pertussis vaccine aggravated an infection with RSV." *Id.* The special master viewed these theories as incompatible.

More specifically, the special master took issue with some of Dr. Shoenfeld's theories, including the introduction of the concept that vaccines may cause "autoimmunity." *Id.*[5] The special master discredited this part of Dr. Shoenfeld's report as irrelevant because Dr. Shoenfeld never explicitly stated that autoimmunity played a role in Olivia's condition. *Id.* Dr. Shoenfeld asserted that his ideas regarding autoimmunity "may" happen, a statement that the special master deemed insufficient to establish preponderant evidence. The special master pointed out that expert opinions regarding possibilities do not meet the burden to prove causation by a preponderance of the evidence. *Id.* at *14–15.

The special master challenged Dr. Shoenfeld's implicit assertion that the acellular pertussis vaccine caused autoimmunity because "petitioners in the Vaccine Program generally do not allege that the pertussis vaccine causes an autoimmune response"; instead, they "more commonly" contend that the vaccine "causes a toxic response" and "directly damages the body." *Id.* at *16. The special master reasoned that "what is required at this stage of the proceeding is that the Simanskis disclose Dr. Shoenfeld's theory.... [A]nd provide the reasons why he believes the theory is reliable." *Id.*

The special master correspondingly ruled that "respondent's [sic] should be informed about the basic information underlying Dr. Shoenfeld's assertion of molecular mimicry." *Id.* ("In connection with Dr. Shoenfeld's discussion of autoimmunity, Dr. Shoenfeld presented the theory of molecular mimicry.").[6]

5. "Autoimmunity" is the "condition characterized by a specific humoral or cell-mediated immune response against constituents of the body's own tissue (self antigens or autoantigens)." *Dor-*

*land's Illustrated Medical Dictionary* 183 (31st ed. 2007).

6. Dr. Shoenfeld's report explained that molecular mimicry

Similar to his critique of Dr. Shoenfeld's discussion of autoimmunity, the special master found Dr. Shoenfeld's assertion that "an infectious antigen incorporated in vaccines ... *may* ... trigger autoimmunity" not to be credible. *Id.* (internal quotation marks omitted). The special master reasoned that "Dr. Shoenfeld's simple assertion of molecular mimicry does not constitute a reliable 'medical theory causally connecting [Olivia's] vaccination and [her] injury.'" *Id.* (alterations in original) (quoting *Althen,* 418 F.3d at 1278). Petitioners "bear the burden of presenting a reliable theory," which means that "some evidence must be presented to demonstrate that the expert's theory passes the test established by the Supreme Court in *Daubert.*" *Id.* at *16 n. 8. The special master explained that other petitioners "have demonstrated the reliability of molecular mimicry by presenting evidence that there is homology (that is, a similar sequence in molecular structure) between a component in a vaccine that the petitioner received and an injured part of the body." *Id.* at *16. The special master observed in a footnote that this was only one way in which petitioners could endeavor to establish reliability and that special masters are instructed under *Althen* "not to require any particular type of evidence to show reliability." *Id.* at *16 n. 8. While petitioners bear a "burden of presenting a reliable medical theory, .... petitioners are not required to established their medical theory to a level of scientific certainty." *Id.* (citing *Knudsen v. Sec'y of Health & Human Servs.,* 35 F.3d 543, 548 (Fed.Cir.1994)).

As with Dr. Shoenfeld's analysis of autoimmunity and molecular mimicry theories, in discussing adjuvants, Dr. Shoenfeld failed to identify one adjuvant that affected Olivia by preponderant evidence.[7] *Id.* at *17. Studies relied on by Dr. Shoenfeld involved mice, not

humans, and no specific theory was asserted to link the studies to Olivia's condition. *Id.*

The special master further found that petitioners had not met their burden of proving a proximate temporal relationship between a vaccination and injury. *Id.* A proximate temporal relationship is demonstrated by examining the time established by the medical community within which it can be inferred that the vaccination caused the disease, coupled with the time during which a petitioner exhibited manifestations of the disease. *Id.* Dr. Shoenfeld's report initially asserted that the "onset of problems" would develop during a five-to-twenty-one-day window. *Id.* Olivia developed symptoms fours days after she received the vaccinations. *Id.* Dr. Shoenfeld later supplemented his report to address this discrepancy and offered three explanations: that Olivia had an immature immune system, that a transfer of antibodies from mother to child during pregnancy "may" accelerate the reaction, and that Olivia's mother "may" have possessed a prior sensitization to the bacteria which could lead to enhanced autoimmunity. *Id.* The special master found that, "[t]he uncertainty inherent in Dr. Shoenfeld's opinions, as they are expressed in his written reports, does not constitute persuasive evidence that Olivia could have reacted quickly," as Dr. Shoenfeld's report asserts. *Id.* The special master discredited Dr. Shoenfeld's assertion on timing by comparing the difference in age of the subjects of the studies upon which Dr. Shoenfeld relied and the types of vaccinations received by the subjects with the facts of Olivia's case. *Id.* at *18.

The special master discussed the evidence presented in another case previously before him. *Id.* In that case a neonatal immunologist testified that "children less than six months old are less likely to develop an

---

is defined by the ability of the autoantigen to impose a disease upon active immunization (the autoantigen itself induce the disease in animal models) and/or passive immunization (transfer of autoreactive-T cells or autoantibodies induce the disease). In the same manner, an infectious antigen incorporated in vaccines (i.e., recombinant, live or attenuated virus etc.) may resemble host antigen and trigger autoimmunity.

Pet'rs' Ex. 16 filed Mar. 24, 2010, at 13 (Fed.Cl. Spec. Mstr.).

7. "Adjuvant" is "a substance that aids another, such as an auxiliary remedy.... [I]n immunology, a nonspecific stimulator of the immune response, such a BCG vaccine." *Dorland's Illustrated Medical Dictionary* 33 (31st ed. 2007).

autoimmune reaction because the children's immune system is not sufficiently strong enough to attack the host." *Id.* (citing *Lampe v. Sec'y of Health & Human Servs.*, 219 F.3d 1357, 1362 (Fed.Cir.2000)). The special master called for further explanation regarding Dr. Shoenfeld's theories as to the temporal element to "place respondent on notice about the extent of Dr. Shoenfeld's opinions" and to allow "the undersigned to prepare for a hearing." *Id.*

The special master questioned when it was that Dr. Shoenfeld asserted that Olivia first developed symptoms of GBS, stating that "[the expert] has not identified what behavior that occurred four days after vaccination was a sign or symptom of GBS." *Id.* at *19. The special master buttressed his view that petitioners had not met their burden of proof with his own review of Olivia's medical records, finding that the physical characteristics exhibited by Olivia during an examination described in her medical records "appear[ ] to be inconsistent with someone suffering" from GBS. *Id.*

Finally, the special master determined that petitioners had not met their burden to demonstrate a logical sequence of cause and effect showing that the vaccination was the reason for the injury. *Id.* at *20. Significant to the special master's findings was the absence of discussion about Olivia between Dr. Shoenfeld's initial recitation of the facts until his conclusion and Dr. Shoenfeld's omission of any "significant discussion of RSV." *Id.* The special master concluded that "Dr. Shoenfeld's reports do not contain an assertion of any reliable theory to explain why a vaccine that Olivia received caused her to develop GBS." *Id.* "Without an explicit presentation of Dr. Shoenfeld's opinions that fit Olivia's case, there appears to be 'too great an analytic[al] gap' to support Dr. Shoenfeld's conclusion." *Id.* (quoting *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)).

Under the additional factors that the special master used to analyze whether dismissal was warranted, the special master determined that a no less severe sanction was available when petitioners could not prevail if, for example, the special master excluded Dr. Shoenfeld's testimony. *Id.* at *21. The show-cause order recited that "respondent should not be required to respond until Dr. Shoenfeld clarifies which opinions he holds to a reasonable degree of probability," because petitioners' failure to "submit a supplemental report from Dr. Shoenfeld prejudices respondent." *Id.* The show-cause order warned petitioners of the potential for dismissal for noncompliance. *Id.* Acknowledging the five-year delay in the production of medical documents and an expert opinion, he indicated that the public policy in expeditious resolution of litigation favored requiring that petitioners supplement their medical report. *Id.* at *21–22. The special master advised that Dr. Shoenfeld's disclosure of his theories prior to the hearing would allow it to proceed more expeditiously and also would aid the special master in managing his docket. *Id.* at *22.

On January 21, 2010, petitioners filed a response challenging the special master's authority to dismiss petitioners' case for failure to comply with the special master's show-cause order and moved for a ruling on the existing record. Respondent filed a brief on February 17, 2010, supporting dismissal. After the special master entered an order on May 13, 2010, dismissing the case, petitioners sought a review of that order, which includes the show-cause order.

## DISCUSSION

### 1. *Standard of review*

■ The Vaccine Act specifies three alternative courses of action available to the Court of Federal Claims in reviewing a special master's decision. The court may

(A) uphold the findings of fact and conclusions of law of the special master and sustain the special master's decision,

(B) set aside any findings of fact or conclusion of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law and issue its own findings of fact and conclusions of law, or

(C) remand the petition to the special master for further action in accordance with the court's direction.

42 U.S.C. § 300aa–12(e)(2). The special master's findings of fact are reviewed under the deferential "arbitrary and capricious" standard. *See id.* § 300aa–12(e)(2)(B); *de Bazan v. Sec'y of Health & Human Servs.*, 539 F.3d 1347, 1350–51 (Fed.Cir.2008); *Lampe*, 219 F.3d at 1360 (explaining that arbitrary and capricious standard is "particularly" difficult to satisfy when issue "turns on the weighing of evidence by the trier of fact"); *Munn v. Sec'y of Dep't of Health & Human Servs.*, 970 F.2d 863, 870 (Fed.Cir. 1992) (noting that arbitrary and capricious standard is "well understood to be the most deferential possible"). In contrast, the special master's conclusions of law are reviewed without deference. *Cedillo v. Sec'y of Health & Human Servs.*, 617 F.3d 1328, 1338 (Fed. Cir.2010); *Munn*, 970 F.2d at 870 (explaining "[i]ssues of law—constitutional imperatives, statutory construction, procedural requirements—come to [the Federal Circuit] for decision with little if any deference owed to or expected by the forums below").

### 2. *Proving causation in Vaccine Act cases*

To be compensated under the Vaccine Act, petitioners must prove that Olivia's injury was caused by a vaccine listed on the Vaccine Injury Table set forth in 42 U.S.C. § 300aa–14. *See id.* § 300aa–11(c)(1)(A),(C); *de Bazan*, 539 F.3d at 1351. The Vaccine Injury Table, 42 U.S.C. § 300aa–14(a), "lists symptoms and injuries associated with each listed vaccine and a time frame for each symptom or injury." *de Bazan*, 539 F.3d at 1351. Petitioners can meet the causation burden in one of two ways. *Walther v. Sec'y of Health & Human Servs.*, 485 F.3d 1146, 1149 (Fed.Cir.2007). If petitioners demonstrate that the injury falls under the Vaccine Injury Table within the time frame prescribed by the Table (a "Table injury"), causation is presumed. *See* 42 U.S.C. § 300aa–14(a); *Walther*, 485 F.3d at 1149. Alternatively, if the injury is not included on the Vaccine Injury Table, or falls outside the prescribed time frame for the symptom to occur, petitioners must prove by a preponderance of the evidence that the vaccine was the cause-in-fact of the injury (an "off-Table" injury). *See* 42 U.S.C. § 300aa–11(c)(1)(C)(i);

*Walther*, 485 F.3d at 1149; *see also Shyface v. Sec'y of Health & Human Servs.*, 165 F.3d 1344, 1350 (Fed.Cir.1999). Causation-in-fact is established by demonstrating by preponderant evidence 1) a medical theory causally connecting the vaccination and the injury; 2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and 3) a showing of the proximate temporal relationship between the vaccination and injury. *Althen*, 418 F.3d at 1278; *see also Broekelschen v. Sec'y of Health & Human Servs.*, 618 F.3d 1339, 1345 (Fed.Cir.2010); *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1322 (Fed.Cir. 2010). Once petitioners meet their burden of proving causation-in-fact, thereby establishing a prima facie case for entitlement, the burden shifts to respondent to prove that the injury was caused by factors unrelated to the administration of the vaccine. 42 U.S.C. § 300aa–13(a)(1)(B); *de Bazan*, 539 F.3d at 1352. In the November 20, 2009 show-cause order, the special master challenged petitioners' contention that Dr. Shoenfeld's reports satisfy the test for causation-in-fact as set forth in *Althen*. *See Simanski I*, 2010 WL 2292200, at *12–20.

### 3. *The parties' evolving positions*

The parties' positions at various times have been confused. Petitioners originally made four objections in their memorandum in support of their motion for review that encompassed two categories: the special master committed 1) a procedural fault and thereby abused his discretion by failing to require respondent to set forth a statement of position in the form of a Rule 4(c) report, by which the special master abdicated his role as an impartial jurist, *see* Pet'rs' Br. filed June 14, 2010, at 17–18, 22; and 2) substantive errors by failing to consider the record as a whole, *id.* at 16, and ultimately by failing to enter judgment in petitioners' favor because petitioners proffered—through Olivia's medical records, Drs. Maertens's and Shoenfeld's medical expert reports, and Ms. Simanski's affidavit—sufficient evidence to meet the *Althen* test, *id.* at 19. Petitioners asserted that the special master did not review Olivia's medical records, the report offered by Dr. Maertens, the 117 scientific articles

offered in support of Dr. Shoenfeld's reports, and Ms. Simanski's affidavit. *Id.* at 16. Because they established a prima facie case, petitioners maintained that the burden shifted to respondent to demonstrate that Olivia's injury was caused by factors unrelated to the vaccines and that the special master erred in denying compensation because the respondent failed to present this rebuttal evidence. *Id.* at 20–21.

Respondent asserted in its brief on review that the special master properly dismissed petitioners' case after reviewing the evidentiary record before him against the *Althen* test. Resp.'s Br. filed July 14, 2010, at 9–10. The essence of respondent's position was that the special master had not erred by dismissing petitioners' case because respondent asserted, and the special master found, that petitioners had not proven causation-in-fact. *Id.* at 9–11. Dr. Shoenfeld's reports were insufficient to establish causation-in-fact because the reports expressed Dr. Shoenfeld's opinion in terms of possibilities, or what "may" have caused Olivia's injury, and therefore cannot be read to establish that it is "more likely than not" that the vaccinations Olivia received caused GBS, particularly when read against recent Federal Circuit precedent that opinions expressed in terms of possibilities are insufficient to establish the *Althen* causation elements. *See id.* at 10–11 (citing *Moberly,* 592 F.3d at 1322). Respondent also challenged petitioners' assertion that they had established a proximate temporal relationship between the vaccination and injury, arguing that the fact Olivia exhibited symptoms four days after her vaccination shots were administered is dispositive, given that Dr. Shoenfeld stated that these symptoms usually occur within a seven-to-twenty-one-day window or with some reports from five to seven days. *Id.* at 11. Finally, respondent asserted that Olivia's symptoms could be attributed to RSV and were discussed by her treating physicians and Dr. Maertens. *Id.* at 14. Respondent argued that, "[w]here evidence on causation is insufficient to establish a prima facie case, petitioner must address and eliminate alternative causes." *Id.* (citing *Walther,* 485 F.3d at 1151).

At oral argument petitioners contended that the special master erred in dismissing the case without requiring respondent to set forth evidence rebutting petitioners' evidence. Transcript of Proceedings at 10, *Simanski v. Sec'y of Health & Human Servs.,* No. 03–103V (Fed.Cl. Sept. 17, 2010) ("Tr.") ("[T]here is no evidence submitted by Respondent which contradicts what Petitioner is stating."); *id.* at 14 ("Fundamental standard[s] requires that each side ... submits evidence to support their respective position[s]."); *id.* at 60 ("If Respondent submits no evidence how can they even hope to prevail if there is no evidence to support their position? The only evidence was submitted by Petitioner, and in that situation the weight has to go for Petitioner."). Petitioners asserted that respondent must present evidence even if it had filed a motion for summary judgment arguing that petitioners had not made a prima facie case. Tr. at 25–26. Petitioners thus appeared to reframe their argument as an objection to the special master's review of only petitioners' evidence.

Not only did petitioners shift away from their argument that respondent must make a record (on file) of its position, but respondent asserted that it had challenged the sufficiency of the petition on several grounds before the special master in unrecorded status conferences. Tr. at 34–35. The court ordered supplemental briefing in an effort to draw out the parties' positions on the procedural options that a special master may utilize in posturing a case for dismissal, a question that petitioners' brief had characterized as a question of first impression. Specifically, the court instructed the parties to set forth their positions on whether summary judgment standards and protections apply in resolving a case on "written submissions," *see* Vaccine R. 8(d), or whether the special master has the authority to dismiss the case without "written submissions," Order entered Sept. 23, 2010, at 3. In light of petitioners' bold assertions in oral argument, the court queried whether respondent must provide rebuttal evidence. *Id.*

The responsive briefs considerably narrow and clarify the issues before the court. The parties agree that the special master is not

required to apply summary judgment standards in resolving a case without an evidentiary hearing. Pet'rs' Br. filed Oct. 6, 2010, at 2 ("In Olivia's case, summary judgment standards and protections are not required because neither the respondent nor Olivia has made a motion for summary judgment."); Resp.'s Br. filed Oct. 15, 2010, at 1 ("Respondent agrees with petitioners that the Vaccine Act does not require the application of summary judgment protections when resolving a case without an evidentiary hearing, if neither party moved for summary judgment."). The parties diverge on the issue of whether the special master was required to rule in petitioners' favor when respondent did not submit rebuttal evidence. Petitioners cite *Jay v. Sec'y of Dep't of Health & Human Servs.*, 998 F.2d 979, 984 (Fed.Cir.1993), for the proposition that, once petitioners carry their statutory burden of proving causation, they are "entitled to judgment as a matter of law" if respondent does not present evidence of alternative causation. Pet'rs' Br. filed Oct. 6, 2010, at 4–5.

Respondent postulates that it is not required to file rebuttal evidence if it challenges the sufficiency of the petition. Resp.'s Br. filed Oct. 15, 2010, at 4. Respondent points out that *Jay* involved the Federal Circuit's review of a motion for summary judgment—a posture that both parties have conceded is not relevant. *Id.* at 5 (distinguishing *Jay* on grounds that it involved a Table injury, whereas instant matter concerns an off-Table injury). Respondent disputes that petitioners have established a prima facie case and contends that the burden never shifted from petitioners to respondent. *Id.* at 4 n. 3, 7 ("[P]etitioners established neither that their daughter suffered a Table injury nor that her injuries were actually caused by her vaccinations. As a result, the burden of persuasion never shifted to respondent."). Coupled with petitioners' assertions during oral argument, Tr. at 25–26, the court infers that petitioners are abandoning their argument that the special master committed a procedural error and are pressing the substantive argument that he erred by not finding for petitioners when respondent had not presented rebuttal evidence.

### 4. *Dismissal for failure to prosecute*

The court would be remiss if it did not mention that at many points over the past several years this case could have been dismissed for failure to prosecute or comply with orders addressing petitioners' failure to perfect the petition by filing statutorily required documents. A decision of a special master to grant or deny compensation should "be issued as expeditiously as practicable but not later than 240 days, exclusive of suspended time under subparagraph (C), after the date the petition was filed." 42 U.S.C. § 300aa–12(d)(3)(A)(ii); *see also* Vaccine R. 10(b) ("The special master must issue a decision on the petition within 240 days after the date the petition was filed, exclusive of all periods of suspension pursuant to Vaccine Rule 9."). Suspensions of the proceedings can be granted for "an aggregate period not to exceed 150 days." 42 U.S.C. § 300aa–12(d)(3)(C); Vaccine R. 9(b) (instructing special master to grant motion for suspension filed by either party for a period of thirty days and authorizing special master to grant any subsequent motion for suspension, if appropriate, "for not more than 150 additional days in total").

Although the Vaccine Act and Vaccine Rules anticipate potential delay in the issuance of a decision, *see* 42 U.S.C. § 300aa–12(g) (giving petitioners the option of withdrawing or choosing "to have the petition remain before the special master" after a 240–day lapse from the filing of the petition); Vaccine R. 10(b),(d), a dismissal for failure to comply with an order or to prosecute a case also is authorized by rule, *see* Vaccine R. 21(b) ("The special master or the court may dismiss a petition or any claim therein for failure of the petitioner to prosecute or comply with these rules or any order of the special master or the court."); *see, e.g., Sapharas*, 35 Fed.Cl. at 505 (holding special master did not abuse his discretion in dismissing case for failure to comply with order to produce medical documents required for petition to be filed); *Tsekouras*, 26 Cl.Ct. at 443 (sustaining special master's dismissal for failure to comply with order to file medical documents that Vaccine Act makes jurisdictional requisite). In the instant case, be-

cause the records were delayed, the chief special master was unable to issue a decision within a statutorily required 240–day time period and issued a notice that petitioners "may withdraw the petition ... or may choose ... to have the petition remain before the special master...." *See* Order entered Sept. 23, 2003 (Fed.Cl. Spec. Mstr.). Petitioners elected to "continue with [their] [p]etition." Pet'rs' Br. filed Oct. 10, 2003 (Fed. Cl. Spec. Mstr.).

However, the Vaccine Act neither provides for, nor envisions, the prolonged process to perfect a petition displayed by the instant case. Petitioners filed a skeletal petition on January 17, 2003, nonspecifically alleging that Olivia received an unnamed injury that was either listed on the Vaccine Injury Table, or alternatively, an off-Table injury that was the cause in fact of her unnamed injury. Pet. ¶ 7. Thus, the key information required to proceed—whether Olivia would be arguing she sustained a Table injury to which a presumption of causation attaches, or whether she would need to prove causation-in-fact— was missing. The chief special master aptly stated that respondent was not required to file a Rule 4(c) report until the petition was complete. *See* Order entered Jan. 24, 2003 (Fed.Cl. Spec. Mstr.). Petitioners' petition remained deficient in claiming a specific injury, perhaps because they could not obtain an immediate diagnosis, *see* Simanski Aff. at 2, and the chief special master ordered petitioners to amend the petition to allege the specific injury that Olivia suffered and to submit affidavits from Olivia's parents.

Petitioners initially also failed to attach any of the medical documents required under 42 U.S.C. § 300aa–11(c). Although the protracted delay in submitting medical documents can be attributed to the difficulty that petitioners encountered in obtaining medical documents from Olivia's initial hospitalization at Mercy Hospital in Des Moines, Iowa, the first set of Olivia's medical records, filed on January 30, 2004, omitted relevant medical documents. Petitioners did not complete the filing of Olivia's medical records until October 1, 2008.

Petitioners also had difficulty in obtaining an expert report, which can be attributed to both impeding factors and petitioners themselves or petitioners' counsel. The record indicates that petitioners' counsel had extreme difficulty in obtaining x-ray films necessary for petitioners' physician to review Olivia's medical records. The chief special master ordered petitioners to produce the x-ray films or show cause why the case should not be dismissed, stating that "[c]urrently the record is devoid" of the necessary supporting medical records or an expert opinion. *See* Order entered Feb. 2, 2005 (Fed.Cl. Spec. Mstr.). The first reviewing physician, Dr. Maertens, did not establish a prima facie case because it lacked a corresponding report from an immunologist. *Simanski I*, 2010 WL 2292200, at *9. This report was not filed until April 1, 2009. This delay occurred, in part, because petitioners' medical expert repeatedly backed out and then recommitted to reviewing Olivia's file. Nonetheless, it took petitioners six years to perfect the petition— a length of time that far exceeds the total time allotted under the statute for the special master to issue a decision (eight months initially, with five months of extension time) and the spirit of expeditious adjudication enshrined by the Vaccine Act. The court does not know how many Vaccine Act "cases" are not, in fact, cases, but rather unperfected petitions molding in the docket as cases, in a prolonged stagnation that is contrary to express statutory provisions.

Although petitioners struggled to perfect their petition, it appears from the record as a whole that petitioners eventually satisfied the jurisdictional requirements for filing a petition. Section 300aa–11(c) mandates that "[a] petition for compensation under the [Vaccine Compensation] Program for a vaccine-related injury or death shall contain ... an affidavit, and supporting documentation" to establish the elements of the claim. 42 U.S.C. § 300aa–11(c)(1). Under the Vaccine Rules, supporting documentation includes "all available medical records supporting the allegations in the petition," Vaccine R. 2(c)(2)(A), and an affidavit "if petitioner's claim does not rely on medical records alone but is also based in any part on the observations or testimony of any person," Vaccine R. 2(c)(2)(B)(ii). The affidavit "should include

the substance of each person's proposed testimony in a detailed affidavit(s) supporting all elements of the allegations made in the petition." *Id.* In conducting a proceeding, the special master may also require such evidence, information and production of documents "as may be reasonable and necessary." 42 U.S.C. § 300aa–12(d)(3)(B). However, while production of documents beyond those that must be submitted in support of a petition is contemplated after an initial petition is perfected, nothing in the statute or the rules indicates that these additional documents are required to perfect the petition. *Compare* 42 U.S.C. § 300aa–12(d)(3)(B) (discussing special master's ability to request documents in addition to those attached with initial filing of petition), *with* § 300aa–11(c)(1) (setting forth contents of a petition). In the instant case, petitioners completed the filing of the medical documents on October 1, 2008, and filed Dr. Shoenfeld's expert medical opinion asserting that a vaccination caused Olivia's GBS, thereby perfecting the filing of their petition on April 1, 2009.

■ A jurisdictional challenge based on petitioners' failure to perfect the petition is distinct from a challenge to the sufficiency of the petition in establishing causation-in-fact. *See Sapharas,* 35 Fed.Cl. at 505; *Tsekouras,* 26 Cl.Ct. at 443. Once a petition is perfected, the special master can resolve issues of insufficiency in one of three ways: 1) on "written submissions," 2) by calling for a motion for summary judgment, or 3) through an evidentiary hearing. *See* Vaccine R. 8. The parties offer conflicting views about what is required in an adversarial proceeding when the sufficiency of the petition has been called into question.

### 5. *Confusion as to how a case may be disposed of after a petition is perfected*

Although petitioners are no longer advancing the argument that they were deprived of an adversarial proceeding, this case illustrates the confusion that exists over what is required of each party, at each stage in the proceeding, within the relaxed adversarial system that the Vaccine Act has come to embody.

"The Vaccine Act does not contemplate full blown tort litigation in the Court of Federal Claims." *Knudsen,* 35 F.3d at 549. *See generally* H.R.Rep. No. 99–908, at 4, (1986), *reprinted in* 1986 U.S.C.C.A.N. 6344, 6345–48 (describing costs of excessive litigation and Vaccine Act's intent to divert petitioners from traditional litigation). The Court of Federal Claims was charged under the Vaccine Act with promulgating rules that provide for a "less adversarial, expeditious, and informal proceeding for the resolution of petitions." 42 U.S.C. § 300aa–12(d)(2)(A). What "less adversarial" means has eluded a prescription for proceedings before the special master, let alone before the Court of Federal Claims.

Congress originally enacted the Vaccine Act to obviate litigating liability predicated on fault. *See* H.R.Rep. No. 99–908, at 3, 1986 U.S.C.C.A.N. at 6344. Because petitioners rarely could prove causation under conventional tort law in state or federal court, the Vaccine Act stepped in to allow recovery without proof of causation for certain injuries deemed vaccine-related and listed on the Vaccine Injury Table. Causation was presumed, *Althen,* 418 F.3d at 1278, and the Vaccine Act statutorily prohibited application of the Federal Rules of Evidence:

Such rules [to be adopted by the Court of Federal Claims] shall—

(A) provide for a less-adversarial, expeditious, and informal proceeding for the resolution of petitions,

(B) include flexible and informal standards of admissibility of evidence,

. . . .

(D) include the opportunity for parties to submit arguments and evidence on the record without requiring routine use of oral presentations, cross-examinations, or hearings, and

(E) provide for limitations on discovery and allow the special masters to replace the usual rules of discovery in civil actions in the United States Court of Federal Claims.

42 U.S.C. § 300aa–12(d)(2)(A)–(E); *see also Hines v. Sec'y of Dep't of Health & Human Servs.,* 940 F.2d 1518, 1525 (Fed.Cir.1991) ("The Claims Court has correctly interpreted

this provision to mean that the Federal Rules of Evidence need not be followed in proceedings under the [Vaccine] Act. . . . ").

The Vaccine Act always has afforded petitioners an opportunity to prove causation-in-fact for injuries that were not included as Table injuries or injuries that did not occur within the specified time frame. *See* 42 U.S.C. § 300aa–11(c)(1)(C)(ii), –13(a)(1)(A); *see also Shyface,* 165 F.3d at 1350. This category of cases, however, did not fuel the litigation crisis that the Vaccine Act attempted to ameliorate in 1986. The Vaccine Act's legislative history makes Congress's intent clear:

> The bill establishes a compensation system for those persons injured by the routine pediatric vaccines. The system is intended to be expeditious and fair. It is also intended to compensate persons with recognized vaccine injuries *without requiring the difficult individual determinations of causation of injury* and without a demonstration that a manufacturer was negligent or that a vaccine was defective.

H.R.Rep. No. 99–908, at 12, 1986 U.S.C.C.A.N. at 6353 (emphasis added).

Two developments have intervened that Congress neither contemplated nor addressed: 1) the United States Supreme Court in 1993 issued its opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), seven years after the Vaccine Act was passed, a seminal case that established the minimum standards for admissible scientific evidence in cases tried in federal courts; and 2) the Vaccine Act practice became dominated by cases that seek to prove causation-in-fact, not cases that seek recovery for a Table injury. The ensuing case law has attempted to impart some discipline to the medical/scientific showing in support of causation-in-fact, while maintaining a relaxed form of litigation.

Much of the recent case law focuses on what medical/scientific showing is required in support of causation-in-fact, but less attention has been given to the development of the parameters of a "less adversarial" proceeding. *See, e.g., Moberly,* 592 F.3d at 1322–26 (discussing proof required for a causation-in-

fact vaccine case); *de Bazan,* 539 F.3d at 1351–52 (same); *Capizzano v. Sec'y of Health & Human Servs.,* 440 F.3d 1317, 1324–27 (Fed.Cir.2006) (same); *Shyface,* 165 F.3d at 1350–53 (same). However, the Federal Circuit recently did provide guidance on what constitutes a "fair proceeding" in *Hazlehurst v. Sec'y of Health & Human Servs.,* 604 F.3d 1343, 1350–51 (Fed.Cir.2010), and *Cedillo,* 617 F.3d at 1342.

Although the specific facts of these cases differ from the instant case, *Cedillo* and *Hazlehurst* reaffirm the Vaccine Act's characterization of proceedings as adversarial. *Hazlehurst* and *Cedillo* were consolidated with a number of cases brought on behalf of children who suffer from autism, alleging their condition was a result of childhood vaccinations. *Hazlehurst,* 604 F.3d at 1345; *Cedillo,* 617 F.3d at 1335. Due to the volume of these cases proceeding before the Court of Federal Claims, the special masters created an Omnibus Autism Proceeding ("OAP") to determine if a link existed between childhood vaccinations and autism. *Cedillo,* 617 F.3d at 1334. Counsel representing the OAP petitioners litigated certain cases first in an attempt to establish the general causation theory; *Cedillo* and *Hazlehurst,* along with *Snyder,* 88 Fed.Cl. at 708, were among the initial cases to be tried. After evidentiary hearings in each case, the respective special master denied the claims for compensation. The Court of Federal Claims affirmed in each case. *Snyder,* 88 Fed.Cl. at 748; *Cedillo v. Sec'y of Health & Human Servs.,* 89 Fed.Cl. 158, 184 (2009), *aff'd,* 617 F.3d 1328 (Fed.Cir.2010); *Hazlehurst v. Sec'y, Dep't of Health & Human Servs.,* 88 Fed.Cl. 473, 490 (2009), *aff'd,* 604 F.3d 1343 (Fed.Cir.2010). *Cedillo* and *Hazlehurst* were appealed to and affirmed by the Federal Circuit. *Cedillo,* 617 F.3d at 1349–50; *Hazlehurst,* 604 F.3d at 1354.

The linchpin in petitioners' theory of causation in each case was evidence obtained from a laboratory in Dublin, Ireland, that was no longer in business. *Cedillo,* 617 F.3d at 1335. The laboratory was established to support civil litigation efforts against vaccine manufacturers in the United Kingdom, and proponents of the laboratory claimed to have

discovered a causal link between a particular vaccine and autism. *Id.* at 1335–36. However, on behalf of the vaccine manufacturers, a molecular biologist, Dr. Stephen Bustin, offered expert testimony and reports discrediting the reliability of the laboratory's methodology and results. *Id.* at 1336. Respondents in *Cedillo* and *Hazlehurst* sought to admit Dr. Bustin's reports and testimony to rebut the petitioners' claim that the tests provided by this laboratory proved that childhood vaccinations can cause autism. Over the petitioners' objection, the special master in *Cedillo* provisionally admitted the evidence. *Hazlehurst,* 604 F.3d at 1347. The records remained open for over a year to afford the petitioners the opportunity to rebut the evidence and obtain additional documentation or an additional cross-examination of Dr. Bustin, but none of the petitioners availed themselves of these opportunities. *Id.* On appeal to the Federal Circuit, the petitioners in both *Cedillo* and *Hazlehurst* objected to admission of Dr. Bustin's testimony and reports garnered from the United Kingdom litigation on the ground that they were not provided with the underlying documentation that led to Dr. Bustin's report and conclusions, as is normally required under Fed.R.Civ.P. 26. *Cedillo,* 617 F.3d at 1340.

In ruling that the special master had not erred in admitting Dr. Bustin's testimony and reports, the *Hazlehurst* panel reaffirmed that the Vaccine Act " 'does not contemplate full blown tort litigation in the Court of Federal Claims.' " *Hazlehurst,* 604 F.3d at 1350 (quoting *Knudsen,* 35 F.3d at 549). In furtherance of the purpose to establish a " 'fair, simple, and easy to administer' " system, "Congress eliminated the usual requirement of proving fault and simplified the process of establishing causation." *Id.* (quoting *Knudsen,* 35 F.3d at 549). In this way proceedings brought under the Vaccine Act are "expeditious, flexible, and *less* adversarial." Vaccine R. 3(b)(2) (emphasis added).

However, the Federal Circuit also confirmed that special masters are required to

conduct some form of an adversarial proceeding, even if relaxed. The *Cedillo* court rested its decision to admit Dr. Bustin's testimony on petitioners' failure to request the underlying documentation of the reports and to conduct an additional cross-examination of Dr. Bustin. For these reasons the court concluded the proceeding was " 'in full accord with the principle of fundamental fairness under Vaccine Rule 8(b)(1).' " *Cedillo,* 617 F.3d at 1342 (quoting *Hazlehurst,* 604 F.3d at 1349). Less adversarial, therefore, does not mean a non-adversarial proceeding.

Although the Vaccine Act does not set forth the specifics of the adversarial proceeding contemplated, the Vaccine Act and Vaccine Rules, applied for twenty years, provide both some guidance and raise further questions.[8] Respondent asserted during oral argument that it is not required, under 42 U.S.C. § 300aa–12(d)(3)(B), to articulate deficiencies in the petition.

Section 300aa–12(d)(3)(B) provides in full, as follows:

> In conducting a proceeding on a petition a special master—
>
> > (i) may require such evidence as may be reasonable and necessary,
> >
> > (ii) may require the submission of such information as may be reasonable and necessary,
> >
> > (iii) may require the testimony of any person and the production of any documents as may be reasonable and necessary,
> >
> > (iv) shall afford all interested persons an opportunity to submit relevant written information—
> >
> > > (I) relating to the existence of the evidence described in section 300aa–13(a)(1)(B) of this title, or
> > >
> > > (II) relating to any allegation in a petition with respect to the matters described in section 300aa–11(c)(1)(C)(ii) of this title, and

---

8. The Federal Circuit has given weight to the language of the Vaccine Rules. *See Patton v. Sec'y of Health & Human Servs.,* 25 F.3d 1021, 1026 (Fed.Cir.1994) (drawing distinction between Rules of the Court of Federal Claims and Vaccine Rules, "which govern practice and procedure for the proceedings of the court and the special masters, respectively," and limiting power of special masters to those enumerated in Vaccine Rules).

(v) may conduct such hearings as may be reasonable and necessary.

There may be no discovery in a proceeding on a petition other than the discovery required by the special master.

*Id.* The broad discretion afforded special masters under 42 U.S.C. § 300aa–12(d)(3)(B), however, is restricted by the framework set forth elsewhere in the Vaccine Act and the Vaccine Rules. *See, e.g., Andreu v. Sec'y of Health & Human Servs.,* 569 F.3d 1367, 1379 (Fed.Cir.2009) ("While considerable deference must be accorded to the credibility determinations of special masters, this does not mean that a special master can cloak the application of an erroneous standard in the guise of a credibility determination, and thereby shield it from appellate review." (citations omitted)); *Capizzano,* 440 F.3d at 1325 (holding special master erred by "impermissibly rais[ing] a claimant's burden under the Vaccine Act and hinder[ing] 'the system created by Congress.' " (quoting *Althen,* 418 F.3d at 1280)); *Althen,* 418 F.3d at 1281 (holding special master erred in requiring petitioners to provide medical documentation of plausibility because Vaccine Act does not require such documentation); *Patton,* 25 F.3d at 1026–27 (Fed.Cir.1994) (holding special master lacks ability to amend a judgment previously entered under Vaccine Rule 1's grant of authority to "regulate the applicable practice" because "the discretion afforded special masters under [the Vaccine Rules] may not be exercised in a manner that would disturb or exceed the framework laid out by the Court of Federal Claims pursuant to its authority under the Act" (internal quotation marks omitted)).

Vaccine Rule 4 supplies the process by which the documents included in the petition are reviewed and a response is filed by the respondent. The rule requires an informal response from respondent within thirty days of the filing of the petition to determine whether additional documents are required to evaluate the merits of a petitioner's claim. Vaccine R. 4(a). The information referred to is that set forth in the Vaccine Act. *See* 42 U.S.C. § 300aa–11(c)(1), (2). Vaccine Rule 4(c) then requires respondent to file a report. The rule states that the report should pres-

ent "any legal argument the respondent may have in opposition to the petition." Vaccine R. 4(c)(2). Such report will include respondent's position as to "why an award should or should *not* be granted." Vaccine R. 4(c)(1) (emphasis added). Read in this context, the Vaccine Rule 4(c) report puts all parties on notice of respondent's position so that the case can proceed efficiently. *See* Guidelines for Practice under the National Vaccine Injury Compensation Program, The Office of Special Masters, United States Court of Federal Claims, at 8 (2004) ("[T]he report should be a straightforward statement of respondent's analysis of petitioner's claim, designed to give both petitioner and the special master full *notice* of, and an *opportunity* to evaluate, the details of respondent's position."). This is the process instituted by the Court of Federal Claims when it promulgated Vaccine Rule 4 under 42 U.S.C. § 300aa–12(d)(2) and 28 U.S.C. § 2071 (2006), and it appears to be the intended course of action in most cases. However, the parties contend that under 42 U.S.C. § 300aa–12(d)(3)(B) the special master has the authority to orchestrate the proceedings and that his powers are so expansive as to pretermit the need for respondent to set forth its statement of position.

The Vaccine Rules reinforce this position by setting forth two methods by which a special master can resolve a case without a hearing. The Vaccine Rules suggest that, once a petition is perfected, the special master can proceed to resolve the matter in one of three ways: 1) on "written submissions," 2) by calling for a motion for summary judgment, or 3) through an evidentiary hearing. *See* Vaccine R. 8. Vaccine Rule 8(d) provides:

The special master may decide a case on the basis of written submissions without conducting an evidentiary hearing. Submissions may include a motion for summary judgment, in which event the procedures set forth in RCFC 56 will apply.

Vaccine R. 8(d).

Respondent can file a motion for summary judgment, which applies a standard for decision well-recognized in the law. *See id.* RCFC 56(b) provides that "[a] party against whom relief is sought may move at any time . . . for summary judgment on all or part of

the claim." RCFC 56(b) (made applicable by Vaccine R. 8(d)). The special master should "deem the material facts claimed and adequately supported by the moving party to be established, except to the extent that such material facts are controverted by affidavit or other written or oral evidence." RCFC 56(c)(1).

Summary judgment ensures specific protections. The nonmoving party is afforded "all applicable presumptions, inferences, and intendments." *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir.1984). Furthermore, when resolving a motion for summary judgment, a fact finder may neither make credibility determinations nor weigh the evidence and seek to determine the truth of the matter. *Cf. Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are ... not [functions] of [the fact finder] ... ruling on a motion for summary judgment...."); *Rockwell Int'l Corp. v. United States*, 147 F.3d 1358, 1361 (Fed.Cir.1998) ("In determining the propriety of summary judgment, credibility determinations may not be made...."). Specifically, "the Vaccine Rules do not authorize factfinding on summary judgment." *Jay*, 998 F.2d at 982. The summary judgment procedure is particularly useful to an opponent challenging the sufficiency of evidence because "[t]he moving party ... need not produce evidence showing the absence of a genuine issue of material fact but rather may discharge its burden by showing the court that there is an absence of evidence to support the nonmoving party's case." *Dairyland Power Coop. v. United States*, 16 F.3d 1197, 1202 (Fed.Cir.1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

In contrast, Vaccine Rule 8 is unclear as to what constitutes "written submissions" and how a special master would be able to dispose of a case by reviewing "written submissions." *See* Vaccine R. 8(d). One example of a "written submission" may include a motion for a show-cause order filed by respondent predicated on the insufficiency of the evidence. However, the court is concerned that this procedure could be used to decide cases on the merits without applying the summary judgment standards and procedures called for in RCFC 56—specifically, the evidentiary presumption that nonmovants are afforded "all applicable presumptions, inferences, and intendments." *H.F. Allen Orchards*, 749 F.2d at 1574. Such a procedure would run contrary to the basic tenets of an adversarial system, even a relaxed one. In a discussion of the summary judgment standard employed in Vaccine Act cases, the Federal Circuit has indicated:

> To allow a special master to weigh and find facts prior to the end of the case (effectively at an arbitrary point in the litigation dictated by the summary judgment movant) would raise serious due process concerns.
>
> Thus, ... in vaccine cases ... summary judgment is summary judgment. If to dispose of the case the special master must resolve conflicts of fact or weigh conflicting evidence, or is statutorily constrained to do so, he or she may not render summary judgment.

*Jay*, 998 F.2d at 983 (citations omitted).

The special master resolved this case on "written submissions." At the April 13, 2009 status conference, respondent discussed filing a motion for summary judgment if petitioners did not supplement their medical expert's report. *See* Order entered June 26, 2009, at 4 (Fed.Cl. Spec. Mstr.); Order entered Apr. 13, 2009, at 2 (Fed.Cl. Spec. Mstr.). However, respondent never filed a motion, and the special master instead proceeded to analyze the information on file that justified the subsequent dismissal for failure to comply with the order to show cause. The special master emphasized that, if the only evidence that existed was Dr. Shoenfeld's conclusory statement, it fell short of establishing the elements of causation articulated in *Althen*. *Simanski I*, 2010 WL 2292200, at *2. The special master cited to Federal Circuit precedent for the rule that " '[c]onclusory expert assertions cannot raise triable issues of material fact on summary judgment.' " *Id.* (quoting *Sitrick v. Dreamworks, LLC*, 516 F.3d 993, 1000 (Fed.Cir.

2008)). However, the special master did not afford petitioners review under the summary judgment standard that would give them the benefit of all inferences; instead, he deemed petitioners' information unpersuasive in concluding that the elements of causation-in-fact articulated in *Althen* have not been met. *Id.* at *12 ("Dr. Shoenfeld's two reports fail to meet the petitioners' burden of producing persuasive evidence on these three [*Althen*] prongs.").

The special master in the instant case drew from the precedents developed and the powers articulated under the Vaccine Act to determine the level of information required to satisfy the causation link. *See id.* at *3–4, *12–20. He sought to expedite the proceeding by directly analyzing the merits of the case without calling for a statement of position from respondent or without calling for a motion for summary judgment. Therefore, the motion for review presents a significant issue that challenges the limitations of what it means to be engaged in a "less adversarial" proceeding: what are the legal standards that the special master must apply if the matter is resolved without a motion for summary judgment or an evidentiary hearing? The special master in the instant case stepped outside the boundaries of an adversarial proceeding, but the Vaccine Act allows him to do exactly that. The posture is further complicated by a motion for review. The Vaccine Act does not resolve the implications of how the special master's broad authority to decide a case on written submissions should be considered on review, a point misunderstood by petitioners and of importance to the instant case.

### 6. *Whether respondent was required to set forth evidence rebutting petitioners' claim*

Petitioners indicated at oral argument that they were not arguing that respondent was required to file a report before the special master could proceed. In their post-argument brief, petitioners insisted that the special master erred by not finding in their favor in the absence of any evidence presented by respondent, contending that the Vaccine Act requires respondent to submit rebuttal evidence. *See* Pet'rs' Br. filed Oct. 6, 2010, at 7.

Petitioners proffer an incorrect formulation of the law. Until petitioners establish a prima facie case, they bear the burden of proving that a vaccine caused Olivia's development of GBS. *See de Bazan,* 539 F.3d at 1352 (holding burden shifts to respondent after petitioner has "established a prima facie case for entitlement to compensation and thus met her burden to prove causation-in-fact"). Respondent is entitled to challenge whether petitioners have established a prima facie case without producing its own evidence. *See Dairyland,* 16 F.3d at 1202 (citing *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548) ("The moving party, however, need not produce evidence showing the absence of a genuine issue of material fact but rather may discharge its burden by showing the court that there is an absence of evidence to support the nonmoving party's case."). In the instant case, respondent announced in a status conference before the special master that it challenged the sufficiency of the petition. *See* Resp.'s Br. filed Feb. 17, 2010, at 9–11 (Fed.Cl. Spec. Mstr.).

To establish that they had met their burden, petitioners could have filed their own motion for summary judgment. In fact, as part of petitioners' January 21, 2010 brief, petitioners moved for the special master to review the record, Pet'rs' Br. filed Jan. 21, 2010, at 10–11 (Fed.Cl. Spec. Mstr.), and the special master found in his May 13, 2010 order that petitioners had not met their initial burden, *see Simanski I,* 2010 WL 2292200, at *2. Petitioners' misunderstanding may stem from their failure to distinguish perfecting a petition from establishing a prima facie case. Once petitioners perfected the petition (after six years), the burden did not shift to respondent to prove that petitioners' submissions were insufficient to establish a prima facie case. Petitioners cite *Jay* for the proposition that "petitioners [are] entitled to judgment as a matter of law because they carried their statutory burden of proving causation." Pet'rs' Br. filed Oct. 6, 2010, at 4 (citing 998 F.2d at 984). *Jay* is distinguishable, first, because the *Jay* court found that the petitioner had proven a Table injury;

thus, "in the absence of proof of a factor unrelated from respondent, petitioners were entitled to a presumption of compensation." Resp.'s Br. filed Oct. 15, 2010, at 5. Second, the *Jay* court was reviewing a motion for summary judgment, a procedural posture that the parties agree is inapplicable to this case.

By comparison, at all times the burden in the instant case was on petitioners to establish a prima facie case. As the special master pointed out, "[E]ven if the Simanskis were found to have submitted persuasive evidence on each of the *Althen* elements, respondent would be entitled to an opportunity to challenge their evidence." *Simanski I*, 2010 WL 2292200, at *2 n. 2. Only when petitioners established a prima facie case would the burden have shifted to respondent to prove alternative causation. The special master found that they had not made a prima facie case. If petitioners' objection, as repeatedly was presented to the court at oral argument, is limited to the special master's denial of compensation based on respondent's failure to produce evidence, the order dismissing the case must be sustained. The special master did not abuse his discretion in failing to require evidence from respondent at this point in the proceeding.

The special master accurately distilled petitioners' argument as ultimately "premised on an assertion that they have satisfied the *Althen* prongs," *Simanski I*, 2010 WL 2292200, at *2, an assumption challenged by respondent, *see* Tr. at 34 (stating respondent objected to the sufficiency of the petition in unrecorded status conferences); Order entered June 26, 2009 at 4 (Fed.Cl. Spec. Mstr.) ("[R]espondent stated that it intended to file a motion for summary judgment, arguing that petitioners had not met their burden as established by [*Althen* ]" (citation omitted)), and found invalid by the special master, *Simanski I*, 2010 WL 2292200, at *12 ("[The show-cause order] contains the explanation for why Dr. Shoenfeld's existing reports are not adequate."). Essentially, petitioners contend that the special master was wrong, an objection to his ultimate factual findings. To support this contention, petitioners give a cursory two-page explanation of how they have met each element of the *Althen* test. Pet'rs' Br. filed Oct. 6, 2010, at 5–7. They submit a handful of "errors" to demonstrate that the special master acted arbitrary and capriciously. These include:

First, the special master failed to consider the record as a whole, as required by § 13(a)(1). There is no indication that the special master reviewed the 24,835 pages of medical records that document Olivia's catastrophic injury, although they directly relate to all three (3) *Althen* prongs. The record also consists of an expert report by Dr. Maertens. There is no indication that the special master considered this report although it directly related to Olivia's medical theory as to how her vaccines may have played a role in her GBS. Dr. Shoenfeld offered the ultimate opinion that Olivia's vaccines caused her GBS, and filed 117 scientific articles in support of his opinions. There is no indication that the special master read any of the articles. Finally, there is no indication that he considered the affidavit of [Julia] Simanski, Olivia's mother.

*Id.*

Petitioners' broad accusations are belied by the record on review. It appears from the special master's show-cause order that he conducted an extensive analysis of the information on file, and information discussed in his order directly contradicts each of petitioners' claims of inadequacy. For example, petitioners assert that "[t]here is no indication that the special master reviewed the 24,835 pages of medical records." *Id.* at 8. Yet, the special master discussed the resulting notes of a physical examination conducted by a neurologist. *See, Simanski I*, 2010 WL 2292200, at *19 ("This physical examination showed that Olivia[ ] moved her extremities well and that her muscle tone was normal with 2+ deep tendon reflexes."). In fact, the special master's recitation of Olivia's medical history is replete with references to her medical record. *See, e.g., id.* at *7 ("Some progress notes from the first days of Olivia's hospitalization indicated that Olivia was neurologically 'stable.' A physical therapist's record indicated that, on February 7, 2001, Olivia had a full range of motion in her

extremities and fluctuating muscle tone."). It appears these notes are from Olivia's medical records.

Petitioners also contend that the special master did not consider Dr. Maertens's report. In fact, the special master specifically discussed the conclusions drawn in Dr. Maertens's report. *Id.* at *9. Petitioners similarly assert that "there is no indication that [the special master] read any of the articles [submitted by Dr. Shoenfeld]." Pet'rs' Br. filed Oct. 6, 2010, at 9. However, the special master directly addressed one of the articles cited by Dr. Shoenfeld in deconstructing the relevance of that article to Olivia's case. *See Simanski I,* 2010 WL 2292200, at *18 (explaining problem with Dr. Shoenfeld's reliance on that particular study was diverging baseline factors—subjects of article were significantly older, received different vaccinations, and developed different diseases). The special master is not required to list each document that he reviewed in making his findings; the court would never burden the special master with such a ridiculous, formulaic requirement. Rather, it is petitioners' burden to identify the information that was ignored and to explain why it materially would affect the result.

Petitioners' assertion that the special master failed to review the record as a whole and their concomitant failure to pinpoint deficiencies in the special master's findings also are symptomatic of their misunderstanding of the nature of the review by the Court of Federal Claims. In essence, petitioners would have the court review the 10,000 pages of documents submitted with the petition, Tr. at 4, and substitute its own findings for those of the special master, *see* Pet'rs' Br. filed Oct. 6, 2010, at 8–9 (accusing special master of not considering record as a whole). However, the statute provides that the Court of Federal Claims may "set aside any findings of fact or conclusions of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of facts and conclusions of law." 42 U.S.C. § 300aa–12(e)(2)(B) (emphasis added). Accordingly, the court can make its own findings only if the special master's decision has

been shown to be arbitrary and capricious. This concept is implicit in the great deference with which the court reviews the special master's findings of fact. *See Lampe,* 219 F.3d at 1360 (explaining that arbitrary and capricious standard is "particularly" difficult to satisfy when issue "turns on weighing of evidence by the trier of fact"); *Munn,* 970 F.2d at 870 (noting that arbitrary and capricious standard is "well understood to be most deferential possible"). "Only in extraordinary cases will the [Court of Federal Claims] undertake to do any independent fact finding. . . . [T]he only time the [Court of Federal Claims] can make its own findings of fact is when that court, as a matter of law, has concluded that the special master was 'arbitrary and capricious.'" *Munn,* 970 F.2d at 870. Petitioners have not articulated to the court reasons for holding the special master's decision arbitrary and capricious. Without such advocacy, the court will not disturb the special master's factual findings.

This case has raised a question concerning the court's role in Vaccine Act cases as distinct from the administrative functions of the special master. In making findings of fact as an original matter, the Court of Federal Claims is bound to apply the Federal Rules of Evidence. 28 U.S.C. § 2503(b) (2006). This stands in stark contrast to the Vaccine Act and the Vaccine Rules, which afford the special master broad discretion and provide for the use of rules other than the Federal Rules of Evidence. *See* Vaccine R. 1 (providing Vaccine Rules govern proceedings brought under the Vaccine Act); 42 U.S.C. § 300aa–12(d)(3)(B) (giving the special master broad discretion in "conducting a proceeding").

Most significantly, the authority of the court to make findings once those of the special master are found arbitrary, granted by 42 U.S.C. § 300aa–12(e)(2)(B), presumes that the court is reviewing a record compiled before the special master. Only in this manner can the court render findings consistent with *Munn's* prescription for limited factual findings. The Federal Circuit explained:

The [Court of Federal Claims], when it independently engages in factfinding, is not exercising expertise beyond that of a

trial court in the usual course. Under this theory we would review the new factual determinations of the [Court of Federal Claims] under the same standard by which we review trial court fact findings in other contexts, and by which we review [Court of Federal Claims] determinations in vaccine compensation cases under the pre–1989 amendments—are they clearly erroneous.

970 F.2d at 871–72.

What is presented in the instant case is a ruling on a procedural issue, and the ruling calls for review of an underlying detailed factual analysis made by the special master. This, the court can do, provided that a petitioner points to deficiencies in the special master's analysis. Unlike the special master, however, the Court of Federal Claims cannot make findings of fact that are subject to review for clear error based on the reams of information submitted with a petition in a non-adversarial proceeding. *Cf. Forshey v. Principi*, 284 F.3d 1335, 1355 (Fed.Cir.2002) (en banc) (clarifying that veterans' benefits cases in proceedings before Veterans' Administration are non-adversarial, whereas proceedings before Court of Appeals for Veterans Claims are adversarial), *superceded on other grounds by statute*, Veterans Benefits Act of 2002, Pub.L. No. 107–330, § 402(a), 116 Stat. 2820, 2832. The Court of Federal Claims cannot itself make findings of fact on a record untutored by advocacy and unaccompanied by prior findings of the special master. Neither the statute itself nor the court's rules contemplate that the court discharge an administrative factfinding function.

For petitioners to mount an adequate challenge to the special master's factual findings, they must point to particular missteps made by the special master. The court will not displace the special master's decision in the absence of petitioners' listing their specific objections to the special master's findings. Therefore, the special master's decision can be sustained on the ground that petitioners invited the court to make its own findings without setting forth their particular objections to the special master's findings, including each item of information on record that was overlooked.

## CONCLUSION

The court concludes that the special master did not abuse his discretion by denying compensation when respondent had not submitted any rebuttal evidence. Accordingly, based on the foregoing, the special master's decision dismissing the petition is sustained, and the Clerk of the Court shall enter judgment accordingly.

**IT IS SO ORDERED.**

No costs on review.